**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **QIANA MARTIN**, *on behalf of herself and all others similarly situated,*<br><br>                Plaintiff,<br><br>   v.<br><br>**BOTTOM LINE CONCEPTS, LLC**,<br><br>                Defendant. | 23 Civ. 8510 (PAE)<br><br>**FIRST AMENDED COMPLAINT**<br>**CLASS ACTION** |

## INTRODUCTION

1. This action arises out of Defendant, Bottom Line Concept's ("Defendant" or "BLC"), practice of making unsolicited prerecorded telemarketing calls without prior express written consent (or any consent whatsoever), in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA").

2. Plaintiff has done no business with Defendant and has never provided Defendant prior express written consent to call her telephone with prerecorded messages.

3. Accordingly, Plaintiff brings this TCPA action on behalf of herself and a class of similarly situated individuals under 47 U.S.C. § 227(b).

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this action arises under the TCPA, which is a federal statute.

5. Venue is proper in this District because Defendant conducts significant amounts of business transactions within this District and because some of the wrongful conduct giving rise to this case occurred in, was directed to, and/or emanated from this District.

6. This Court has jurisdiction over BLC because BLC conducts business transactions

1

in this District and has committed tortious acts in this District.

7.     Specifically, Defendant directed artificial or prerecorded voice messages to Plaintiff's cellular telephone in this District, and Plaintiff received those artificial or prerecorded voice messages in this District.

## PARTIES

8.     Plaintiff Qiana Martin ("Martin") is, and at all times mentioned herein was, a citizen and resident of New York, New York.

9.     Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

10.    Defendant is, and at all times mentioned herein was, a limited liability company organized and existing under the laws of Florida headquartered at 3323 NE 163rd Street, Suite 302, Miami Beach, Florida 33160.

11.    Defendant is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153 (39).

## GENERAL FACTUAL ALLEGATIONS

12.    In 2020, Congress created the Employee Retention Credit ("ERC") tax break to reward businesses and nonprofits for keeping employees on payrolls during the pandemic.

13.    The ERC tax break has turned into a bonanza for firms, like BLC, that work with individuals and businesses to claim the tax credit.

14.    For example, in a recent Wall Street Journal article[1], BLC is noted as pursuing more than $6 billion dollars in ERC refunds that could yield BLC more than $1 billion dollars in fees.

---

[1] https://www.msn.com/en-us/money/markets/inside-a-sales-army-turning-a-tax-break-into-a-modern-day-gold-rush/ar-AA1gcVgG (last accessed Nov. 7, 2023).

15.     BLC's founder, Josh Fox, is cited as referring to the ERC tax break as a "modern-day gold rush."[2]

16.     In order to market its services, Defendant, and various affiliates acting on its behalf, make prerecorded telemarketing calls soliciting individuals to work with Bottom Line to submit ERC applications.

17.     Because each of these calls were advertising Defendant's products and/or services, they constitute telemarketing and telephone solicitations.

## BLC'S REFERRAL PARTNER PROGRAM

18.     In order to cash in on the ERC program to the maximum extent possible, in addition to its own direct marketing efforts, BLC relies on "Referral Partners" to drive new businesses and individuals to BLC[3]:



---
[2] *See* https://www.dailymail.co.uk/yourmoney/article-12483807/How-pandemic-tax-break-small-businesses-cost-taxpayers-billions-turned-modern-gold-rush-thanks-consultancy-firm-plugged-Shark-Tank-star-Kevin-OLeary.html (last accessed Nov. 8, 2023)

[3] https://erc.bottomlinesavings.com/wp-content/uploads/2022/09/Bottom-Line_Commission (last accessed Nov. 8, 2023).

19.     "Shark Tank" veteran Kevin O'Leary is Bottom Line's best-known Referral Partner and has promoted ERC on television and social media.[4]

20.     BLC will partner with its Referral Partners to create entities used for advertising and booking ERC calls with BLC.

21.     For example, O'Leary and BLC are partners in a company called WonderTrust, an entity used for advertising and booking ERC calls with BLC.

22.     In addition to O'Learly, BLC has also created a referral network that allegedly consists of more than 50,000 Referral Partners.[5]

23.     Josh Fox, BLC's CEO, holds online seminars and produces online videos called "Become a Millionaire with Bottom Line" to recruit new Referral Partners to drive new business and individuals to BLC.[6]

24.     On these videos, Josh Fox "runs through the numbers" and shows the potential commissions that would be due to BLC and its potential Referral Partners, typically 10% of BLC's commission, which is sometimes as much as 25-30% of the IRS refund.

25.     BLC directly trains its Referral Partners to market on BLC's behalf, including but not limited to providing its Referral Partners with multiple marketing resources.

26.     For example, BLC provides its Referral Partners with interactive online trainings and instructional zoom meetings where BLC teaches its Referral Partners how to market on behalf of BLC.[7]

---

[4]  *See id.*
[5]  *See* https://www.marketwatch.com/video/wsj-explains/how-an-obscure-tax-break-became-a-gold-rush/3AA902C0-5E7E-42B1-B862-D72850518B08.html?mod=home-page, at 4:18 (last accessed Nov. 7, 2023).
[6]  *Id.* at 4:37.
[7]  https://erc.bottomlinesavings.com/rp-resources/ (last accessed Nov. 7, 2023).

27.    BLC provides its Referral Partners with e-mail templates, scripts and signature blocks that include links that link directly to BLC websites and BLC created information:



28.    BLC provides its Referral Partners with an entire training "academy, including videos and written educational materials."



29.     BLC also instructs its Referral Partners on how to market for BLC, which includes instructing and encouraging its Referral Partners to "do cold calling, cold email, direct mail, various forms of online marketing, or whatever you are most comfortable with."[8]



<hr />

8

https://bottomlineconception.com/affiliate?utm_source=campaignrp&utm_medium=rp&utm_campaign=firsterc-xyz#icoh6o (last accessed November 7, 2023).  Although this website is "bottomlineconception.com", upon information and belief, it is owned and operated by BLC.  For example, when an individual registers on this website, they are sent an agreement signed by Josh Fox.  The registrant also receives a personal referral link from rp@bottomlinesavings.com.

## PLAINTIFF'S FACTUAL ALLEGATIONS

30.     Ms. Martin is the user of a cellular telephone number ending in 0214.

31.     Ms. Martin received numerous prerecorded calls from BLC, or one or more of BLC's referral partners acting on its behalf and at its direction, the full extent of which will be confirmed in discovery.

32.     For example, and most recently, on August 30, 2023 at 3:02pm, Ms. Martin received a prerecorded call from (800) 728-9015, which left the following prerecorded message on her voicemail, in the voice of famous rapper Snoop Dogg:

> [beginning cut off]. . . you might be sitting on a refund that's rightfully yours.  But, check this out I got a hook up for you.  It's called ERCENROLL.COM and they got the game on lock. Now here's the kicker. These folks at ERCENROLL.COM, they got connections like no other.  They can have them funds in your hands quicker than you can roll up your favorite . . . well, you know what I mean. We're talking just a couple weeks and BOOM you got that cash flowing back where it belongs. So, if you're a business owner who's been through the thick of it, don't miss out on this golden opportunity. Slide on over to ERCENROLL.COM.  Let them know Snoop Dogg sent you and watch the magic happen.  It's all about getting what's yours baby.  ERCENROLL.COM.  They're the real deal and they got that fast track hook up y'all.  Snoop Dogg stamp of approval baby.  Peace out.

33.     When telephone numbers (800) 728-9015 is called, a prerecorded message states "thank you for calling the Employee Retention Hotline brought to you by BottomLine Capital."

34.     Upon information and belief, BottomLine Capital is a d/b/a of BLC.

35.     For example, the logo on the BottomLine Capital website notes that it is "*powered by Bottom Line Concepts*" [9]:



[9] *See* https://bottomlinecapital.com/faqs/ (last accessed Sept. 20, 2023).  Since the filing of this lawsuit, the logo on the bottomlinecapital.com website has been altered to remove the reference to Bottom Line Concepts.

36.     In addition to BottomLine Capital, BLC uses other fictious names such as "BottomLine Savings."

37.     Alternatively, BottomLine Capital is a Referral Partner of BLC, that was recruited by BLC, participated in BLC's training program, and was instructed to market on behalf of BLC.

38.     An internet search reveals that other consumers report received the same spam call from "Snoop Dogg" pitching the ERC tax credit:



---

[10] https://twitter.com/mttgrmm/status/1696976075535061193 (last accessed Sept. 20, 2023). *See also* https://www.tiktok.com/@ellabadamp/video/7270205678193544491 (last accessed Nov. 10, 2023); https://www.tiktok.com/@tony2gunss/video/7278834044886895914 (last accessed Nov. 10, 2023).

39.     Ms. Martin never provided prior express written consent (or any consent) to BLC or any of its Referral Partners for these telephone calls.

## DEFENDANT'S LIABILITY

40.     Because Defendant's calls constitute telemarketing, Defendant was required to obtain prior express written consent from the persons to whom Defendant made calls.

41.     "Prior express written consent" is specifically defined by statute as:

[A]n agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

47 C.F.R. §64.1200(f)(8)

42.     Ms. Martin never provided Defendant or any of its Referral Partners with any consent, written or otherwise.

43.     Accordingly, each of Defendant's and/or its Referral Partners' telemarketing calls to Ms. Martin using an artificial or prerecorded voice violated 47 U.S.C. § 227(b).

44.     For violations of 47 U.S.C. § 227(b), Ms. Martin is entitled to a minimum of $500 per call.

45.     Ms. Martin is entitled to $1500 per call if Defendant's actions are found to be knowing or willful.

46.     Defendant is liable for each of the prerecorded calls under one or more of the following theories of liability: (1) Direct Liability, (2) Actual Authority, (3) Apparent Authority, (4) Ratification, (5) Joint Enterprise, and Acting in Concert.

**DIRECT LIABILITY**

47.     BLC's scheme involves the use of unlawful prerecorded telemarketing calls as alleged herein, to advance their pecuniary or business interests.

48.     BLC directly initiated the unlawful prerecorded telemarketing calls to Plaintiff and Class members and is directly liable for violating the TCPA.

49.     The prerecorded calls made to Plaintiff and Class members came from a telephone number that, when called back, played a message stating: "thank you for calling the Employee Retention Hotline brought to you by Bottom Line Capital."  At the time of the calls, BottomLine Capital's website noted that BottomLine Capital is "*powered by Bottom Line Concepts*".

50.     Upon information and belief, since the filing of this lawsuit, BLC has taken affirmative steps to make it appear that BLC had no connection to the calls, including by removing the phrase "*powered by Bottom Line Concepts*" from the BottomLine Capital website (www.bottomlinecapital.com).

51.     All of the prerecorded calls alleged herein were sent to Plaintiffs and Class members in order to drive them to BLC for the purpose of engaging BLC to obtain an ERC tax refund on their behalf for a fee.

52.     BLC initiated and made the prerecorded calls, so they are directly liable for their transmission to Plaintiffs and Class members.

**ACTUAL AUTHORITY**

53.     The TCPA incorporates federal common law agency principles.

54.     To the extent BLC outsources the act of executing the unlawful calls to third parties, such as BLC's numerous Referral Partners, such an act would not and does not absolve BLC from liability under the TCPA.

55.     In addition, to the extent BLC's agreements put restrictions on any form of marketing, this was merely a façade as BLC later instructed its Referral Partners to engage in marketing that violated its own "restrictions."

56.     For example, BLC may not have had control over the list of persons to whom calls were made and certain content of the messages – but specified and directed the third parties to essentially engage in all marketing means, including instructing them to specifically make "cold calls."[11]



---

57. By signing contracts making the third parties (i.e., Referral Partners) authorized agents—expressly or impliedly—to execute unlawful calls to Plaintiff and Class members, Defendants are liable for violations of the TCPA.

58. For the important details of the transactions, BLC had control over the third-party Referral Partners, but the third-party Referral Partners may have had a range of discretion in deciding how to carry out their calling campaigns.

59. That discretion was necessarily limited by implication, including the Referral Partners' economic incentive being tied to the number of individuals they drove to BLC, the Referral Partners' business, and shared knowledge by BLC and the Referral Partners regarding what methods most effectively drive new customers to BLC.

60. In addition, BLC provided each Referral Partner with a referral link so that BLC could track the Referral Partner's activity and compensate them for their portion of the commission.

61. Indeed, the FCC acknowledges that vicarious liability is imposed where the caller is "unsupervised." 28 F.C.C. Rcd. at 6588.

62. During all relevant times, BLC knew that the third persons were engaged in marketing practices constituting unlawful calling to direct consumers to BLC and its services, in accordance with the specifications and contractual provisions agreed to by BLC and the Referral Partners.

63. BLC accepted, did not object to, and benefitted from the Referral Partners' violations of the TCPA.

64. BLC directed and controlled the conduct of the Referral Partners by, *inter alia*, instructing and closely controlling the content of the calls and contacts with Plaintiff and other call

recipients, controlling and monitoring the direction, and manner of their conduct on behalf of BLC, establishing and enforcing guidelines and specifications of the Referral Partners' activities on behalf of BLC, retaining rights to modify, amend, or withdraw the Referral Partners' authority to act on behalf of BLC in making the unlawful calls, compensating the Referral Partners for engaging in conduct that violated the TCPA, knowing that the Referral Partners engaged in conduct that violated the TCPA or instructing them, impliedly or expressly, not to disclose information that, if known by BLC, would establish BLC's knowledge that the Referral Partners were engaged in conduct violating the TCPA.

65.     Due to the anonymous/private nature of the websites and the subscriber information for the outbound telephone numbers, Plaintiff has no access to information to identify the exact relationship between BLC and the Referral Partner(s) who are the anonymous public facing arm of Defendants' unlawful calling scheme.

66.     However, Plaintiff is not required to know this information at the pleading stage. *Dish Network* states that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." 28 F.C.C. Rcd., at 6592–93 (¶ 46).

## <u>APPARENT AUTHORITY</u>

67.     *Dish Network* further clarifies the circumstances under which a telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the [third party] access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as

the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

28 FCC Rcd. at 6592 (¶ 46).

68.     BLC allowed the Referral Partners to enter consumer information into their systems as well as to use BLC's website links and website content to send to consumers.

69.     Specifically, BLC allowed the Referral Partners to provide the individuals they called with an electronic means to schedule calls directly with BLC representatives.

70.     BLC gave the Referral Partners the authority to use their websites, hyperlinks, URLs, trade name, trademark, service mark, forms, contracts, and materials.

71.     The Referral Partners did not independently identify themselves to Plaintiff and the other Class members or provide their contact information.

72.     Instead, at times the Referral Partners masqueraded as other actors, such as "ERCENROLL" or Snoop Dogg to induce recipients to call back or go to a website to schedule a time to consult with a BLC representative.

## **RATIFICATION**

73.     BLC knowingly and actively accepted business and contacts with consumers that originated through TCPA-violating calls placed by its Referral Partners.

74.     BLC ratified the Referral Partners' TCPA violations by knowingly accepting the benefit of new contacts with consumers despite the fact that these consumers were generated through conduct that violates the TCPA.

75.     Alternatively, BLC ratified the Referral Partners' TCPA violations by knowing facts that would cause an ordinarily prudent person to inquire as to whether the Referral Partners were complying with the TCPA, or create reasonable suspicion that the Referral Partners do not comply with the TCPA, willfully turning a blind eye to those facts, and accepting the benefit of new consumer contacts despite the fact that they were generated through conduct that violates the TCPA.

76.     BLC ratified the TCPA violations of the Referral Partners by being willfully ignorant of the violations or by being aware that such knowledge was lacking and accepting the benefits of the TCPA violations.

77.     BLC has received numerous complaints regarding the conduct of the entities that make prerecorded calls on their behalf and BLC refuses to alter its business practices at all in response.

78.     BLC knew that the Referral Partners engaged in conduct that violated the TCPA and generated numerous consumer complaints because of their telemarketing practices, but failed to terminate their relationship with the Referral Partners and continued to do business with them.

**JOINT ENTERPRISE**

79.     BLC and its Referral Partners had a tacit agreement, or approved of after the fact, for the marketing of BLC's services by means that violate the TCPA, including making unsolicited

calls to cellular phone numbers using a prerecorded or artificial voice, all without obtaining prior express consent to engage in such conduct.

80.     BLC and the Referral Partners were part of a common enterprise and had a community of interest in marketing and promoting BLC's websites, services, and products.

81.     Indeed, the Referral Partners would receive a percentage of the commission due to BLC for the consumers they drove to BLC that ultimately used BLC's services.

82.     BLC and the Referral Partners had an equal right to control the conduct thereof by specifying the type of people to be called, when to call, and what to say on the calls.

83.     BLC and the Referral Partners entered into an agreement on how the proceeds of the unlawful activities would be apportioned among them.

84.     BLC and the Referral Partners are jointly and severally liable for the resulting damage caused by the Referral Partners' TCPA-violating conduct.

## ACTING IN CONCERT

85.     BLC acted in concert with the Referral Partners when they made the illegal calls in violation of the TCPA, as alleged herein.

86.     BLC received the benefit of the consumer contacts generated by the Referral Partners.

87.     BLC compensated the Referral Partners for engaging in conduct that violated the TCPA.

88.     BLC and the Referral Partners agreed and were part of a common design to "cold call" consumers in order to generate business and consumer contacts.

89.     BLC had a tacit understanding that the Referral Partners would engage in telemarketing activity that violated the TCPA.

90.     BLC knew that the Referral Partners' conduct was a breach of duty to Plaintiff.

91.     BLC gave the Referral Partners substantial assistance in accomplishing the tortious result, including compensating the Referral Partners for generating clients for BLC pursuant to calls and giving instructions on the content, volume, and manner of the calling activities.

92.     BLC encouraged its Referral Partners to use techniques that would result in the most contacts to potential customers (i.e., "cold calling") and impressed upon them a sense of urgency noting that the government program would eventually run out of money.

93.     BLC furthered the tortious conduct by their cooperation, and lending aid to the Referral Partners, and adopting the Referral Partners' actions for their own benefit.

94.     BLC's own conduct constitutes a breach of duty to Plaintiff.

95.     BLC acted tortiously, and the harm resulted from the robocalling by BLC and the Referral Partners.

96.     BLC is liable for the resulting damage caused by the Referral Partners.

97.     BLC's violations were negligent.

98.     Alternatively, BLC's violations were willful and knowing.

99.     For example, BLC's violations were willful and knowing because BLC has received and responded to, via the Better Business Bureau[12], numerous consumer complaints abouts its unsolicited calling practices:

---

[12] https://www.bbb.org/us/fl/north-miami-beach/profile/government-grant-services/bottom-line-concepts-llc-0633-92026597/complaints (last accessed Nov. 8, 2023).



**Initial Complaint**
06/09/2023

**Complaint Type:** Advertising/Sales Issues
**Status:** Answered

Grand Traverse Distillery is receiving at least 3 to 5 calls a week for months from Bottom Line. We have told them we are not interested and take us off their call list. They will not.Our staff is worn out answering their calls but their reps continue to call. I went to their web site to look for a do not call list and there is not one, No way to get them to stop.FCC should get involved with this company.*********************



**Business response**
06/16/2023

see attached

---



**Initial Complaint**
05/09/2023

**Complaint Type:** Advertising/Sales Issues
**Status:** Resolved

They have contacted me 9 times without my consent, even after repeated attempts to get them to stop. They have violated the **** and owe me thousands of dollars in damages. If I do not hear from them soon, I will *** them. I have already emailed their CEO.



**Business response**
05/31/2023

see attached

---



**Initial Complaint**
04/27/2023

**Complaint Type:** Advertising/Sales Issues
**Status:** Resolved

Bottomline Concepts has been using a third party advertiser to repeatedly call my cell phone, even though it is on the Do Not Call list, and I have asked them to stop multiple times. They are trying to sell me some kind of ERC service. I actually have this last call recorded, and the rep clearly states that he works for Bottomline Concepts. I attempted to reach out to the company to address the matter, but have been ignored. At this point, I need to speak to the company's ATTORNEY or LEGAL REPRESENTATION to resolve the issue. If that does not happen in a timely manner, I will be pursuing significant legal action against the company. They need to understand that even if they are using a third party to make these calls, the law clearly states that they are still responsible for them. Hopefully we can get this resolved before I am forced to take legal action.



**Business response**
05/31/2023

see attached

---



**Initial Complaint**
04/14/2023

**Complaint Type:** Advertising/Sales Issues
**Status:** Answered

Multiple phone calls and voicemail messages although I have repeatedly asked them to remove my number. When they leave a message and I return the call to the number they leave, it says my number is blocked. This is harassment and is affecting my ability to perform my business and take care of my customers.

**Business response**
05/31/2023

see attached

100.    Despite these complaints, BLC adopted a culture of disregarding consumer requests to stop calling and keeps calling, and allows and encourages its Referral Partners to keep calling.

101.    Based on the numerous consumer complaints about unwanted and unsolicited telemarketing calls that were lodged with the BBB before Plaintiff filed her lawsuit, BLC and its Referral Partners have taken no action to curb their abusive and illegal telemarketing practices and Plaintiff and class members remain vulnerable to continued harassment from BLC and its Referral Partners.

102.    BLC has also been a defendant in numerous TCPA lawsuits throughout the country. *See, e.g.*, *Callier v. Bottom Line Concepts, LLC,* Civ. No. 3:23-cv-00180 (W.D. Tex.); *Rojas v. Bottom Line Concepts, LLC et al.*, Civ. No. 2:23-cv-02667 (C.D. Cal.); *Baughman et al. v. Bottom Line Concepts LLC*, 23-cv-21862 (S.D. Fla.); *Fridline v. Bottom Line Concepts, LLC*, 4:23-cv-01193 (M.D. Pa.).

103.    BLC will continue to violate the TCPA and ignore consumers' privacy rights unless and until it is enjoined from doing so.

104.    Ms. Martin and the class were damaged by the violations alleged herein. Their privacy was improperly invaded, BLC and/or its Referral Partners' calls temporarily seized and trespassed upon the use of their phones, and/or they were forced to divert attention away from other activities to address the unwanted telephone calls. BLC's telephone calls were annoying and a nuisance, and wasted the time of Ms. Martin and the class members. *See, e.g., Mims,* 565 U.S. at 372 (discussing congressional findings of consumer "outrage" as to prerecorded calls)

105.    These forms of actual injury are sufficient for Article III standing purposes.

# CLASS ACTION ALLEGATIONS

106.    Plaintiff brings this action under Fed. R. Civ. P. 23 on behalf of a class defined as follows:

> Plaintiff and all persons within the United States to whose telephone number Defendant placed (or had placed on its behalf) a prerecorded or artificial voice telemarketing call, from four (4) years prior to the filing of the Complaint through the date of Certification.

(the "Class")

107.    Excluded from the Class are Defendant and any entities in which Defendant has a controlling interest; Defendant's agents and employees; any Judge and Magistrate Judge to whom this action is assigned and any member of their staffs and immediate families, and any claims for personal injury, wrongful death, and/or emotional distress.

108.    The Members of the Class for whose benefit this action is brought are so numerous that joinder of all members is impracticable.

109.    The exact number and identities of the persons who fit within the Class are ascertainable in that Defendant and third parties maintain written and electronically stored data showing:

    a.  The time period(s) during which Defendant placed its calls;

    b.  The telephone numbers to which Defendant placed its calls;

    c.  The telephone numbers for which Defendant had prior express written consent;

    d.  The purposes of such calls; and

    e.  The names and addresses of Class members.

110.    The Class is comprised of hundreds, if not thousands, of individuals.

111.    There are common questions of law and fact affecting the rights of the Members of the Class, including, *inter alia*, the following:

a. Whether Defendant (or someone acting on its behalf) used an artificial or prerecorded voice in placing its calls;

b. Whether Defendant (or someone acting on its behalf) obtains prior express written consent;

c. Whether Plaintiff and the Class were damaged thereby, and the extent of damages for such violations; and

d. Whether Defendant should be enjoined from engaging in such conduct in the future.

112.   Plaintiff is a member of the Class in that Defendant placed calls utilizing an artificial or prerecorded voice without her prior express written consent.

113.   Plaintiff's claims are typical of the claims of the Members of the Class in that they arise from Defendant's uniform conduct and are based on the same legal theories as these claims.

114.   Plaintiff and all putative Members of the Class have also necessarily suffered concrete harm in addition to statutory damages, as all Members of the Class spent time tending to Defendant's unwanted calls and suffered a nuisance and an invasion of their privacy.

115.   Plaintiff has no interests antagonistic to, or in conflict with, the Class.

116.   Plaintiff will thoroughly and adequately protect the interests of the Class, having retained qualified and competent legal counsel to represent her and the Class.

117.   Defendant has acted and refused to act on grounds generally applicable to the Class, thereby making injunctive and declaratory relief appropriate for the Class.

118.   The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications.

119. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since, *inter alia*, the damages suffered by each class member make individual actions uneconomical.

120. Common questions will predominate, and there will be no unusual manageability issues.

## FIRST CAUSE OF ACTION
### Violations of the TCPA, 47 U.S.C. § 227(b)
### (On Behalf of Plaintiff and the Class)

121. Plaintiff and the proposed Class incorporate the foregoing allegations as if fully set forth herein.

122. Defendant placed, or had placed on its behalf, prerecorded telemarketing telephone calls to Plaintiff's and Class Members' telephone numbers without prior express written consent.

123. Defendant has therefore violated 47 U.S.C. § 227(b).

124. As a result of Defendant's unlawful conduct, Plaintiff and Class Members are entitled to an award of $500 in statutory damages for each call, pursuant to 47 U.S.C. § 227(b)(3)(B).

125. Plaintiff and Class Members are entitled to an award of treble damages in an amount up to $1,500 for each call made knowingly and/or willfully, pursuant to 47 U.S.C. § 227(b)(3).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for the following relief:

A. An order certifying the Class as defined above, appointing Plaintiff as the representatives of the Class and appointing her counsel as Class Counsel;

B.      An order declaring that Defendant's actions, as set out above, violate 47 U.S.C. § 227(b);

C.      An award of injunctive and other equitable relief as necessary to protect the interests of the Class, including, *inter alia*, an order prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

D.      An award of statutory damages;

E.      An award of treble damages;

F.      An award of reasonable attorneys' fees and costs; and

G.      Such other and further relief that the Court deems reasonable and just.


## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

**Dated:** November 13, 2023                    **THE DANN LAW FIRM**

*/s/ Javier L. Merino*
Javier L. Merino, Esq.
**THE DANN LAW FIRM**
1520 U.S. Highway 130, Suite 101
North Brunswick, NJ 08902
notices@dannlaw.com
Tel: (201) 355-3440
Fax: (216) 373-0536

Marc Edward Dann
**THE DANN LAW FIRM**
15000 Madison Avenue
Lakewood, OH 44107
Tel:  216-373-0539
Fax: 216-373-0536
notices@dannlaw.com

Max S. Morgan, Esquire
**THE WEITZ FIRM, LLC**
1515 Market Street, #1100
Philadelphia, PA 19102
Tel: (267) 587-6240
Fax: (215) 689-0875
<u>max.morgan@theweitzfirm.com</u>

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing was filed electronically with the Clerk's office using the CM/ECF system and served via the Court's CM/ECF system upon all parties accepting electronic service on this 13th day of November 2023.

<u>*/s/ Javier L. Merino*_____</u>

Javier L. Merino, Esq