UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

QIANA MARTIN, *on behalf of herself and all others similarly situated,*

Plaintiff,

-v-

BOTTOM LINE CONCEPTS, LLC,

Defendant.

---

23 Civ. 8510 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This putative class action arises out of alleged violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227 *et seq.*, involving the artist known professionally as Snoop Dogg.

Plaintiff Qiana Martin claims that on August 30, 2023, at 3:02 p.m., she received a robocall, purportedly from Snoop Dogg. Dkt. 15 ("First Amended Complaint" or "FAC") ¶¶ 32, 48. The call went to her voicemail. *See id.* ¶ 32. The prerecorded message touted a federal tax break known as the Employee Retention Credit (or "ERC") as having the "Snoop Dogg stamp of approval" and told Martin to go to "ERCEnroll.com" to get "them funds in your hands quicker than you can roll up your favorite . . . well, you know what I mean." *Id.* ¶¶ 12–13, 32. Martin alleges that the robocall was placed by, or is otherwise attributable to, defendant Bottom Line Concepts, LLC ("BLC"), *see id.* ¶¶ 47–101, such that BLC violated the TCPA.

Pending now is BLC's motion to dismiss Martin's FAC under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons that follow, the Court denies BLC's motion in substantial part, granting it only as to the FAC's request for injunctive relief.

## I.     Background

### A.     Factual Background[1]

#### 1.     The Parties

Martin is a citizen of New York. FAC ¶ 8. BLC is a consulting firm organized under the

laws of Florida. *Id.* ¶ 10.

#### 2.     The Robocall

On August 30, 2023, at 3:02 p.m., Martin allegedly received a prerecorded voice message

on her mobile telephone which stated:

> [Y]ou might be sitting on a refund that's rightfully yours. But[] check this out I got
> a hook up for you. It's called ERCENROLL.COM and they got the game on lock.
> Now here's the kicker. These folks at ERCENROLL.COM, they got connections
> like no other. They can have them funds in your hands quicker than you can roll
> up your favorite . . . well, you know what I mean. We're talking just a couple weeks
> and BOOM you got that cash flowing back where it belongs. So, if you're a
> business owner who's been through the thick of it, don't miss out on this golden
> opportunity. Slide on over to ERCENROLL.COM. Let them know Snoop Dogg
> sent you and watch the magic happen. It's all about getting what's yours baby.
> ERCENROLL.COM. They're the real deal and they got that fast track hook up
> y'all. Snoop Dogg stamp of approval baby. Peace out.

FAC ¶ 32. Martin identified the voice as that of the rapper Snoop Dogg. *Id.* The voice message

was left by (800) 728-9015. *Id.* When that number is called, a prerecorded message plays:

"[T]hank you for calling the Employee Retention Hotline brought to you by Bottom[ ]Line

Capital." *Id.* ¶ 33.

---

[1] The Court draws the facts in this decision from the FAC, Dkt. 15, and the exhibits incorporated
therein. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a
motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may
consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and
documents incorporated by reference in the complaint."). For the purpose of resolving BLC's
motion to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the FAC as
true and draws all reasonable inferences in Martin's favor. *See Koch v. Christie's Int'l PLC*, 699
F.3d 141, 145 (2d Cir. 2012).

### 3.    BLC's Business Model

The FAC alleges that BLC's business model works as follows.  After Congress enacted the Employee Retention Credit (or "ERC") in 2020 to "reward businesses and nonprofits for keeping employees on payrolls during the pandemic," *id.* ¶ 12, firms like BLC realized they could "work with individuals and businesses to claim the tax credit," *id.* ¶ 13, and then take a percentage of the refund—"sometimes as much as 25–30%," *id.* ¶ 12.  The ERC "has turned into a bonanza for" BLC, *id.* ¶ 13, which, a recent article states, is "pursuing more than $6 billion dollars in ERC refunds that could yield [it] more than $1 billion dollars in fees," *id.* ¶ 14.  The FAC quotes BLC's founder, Josh Fox, as terming the ERC a "modern-day gold rush."  *Id.* ¶ 15.

To solicit new customers, BLC relies on both its own direct marketing efforts and a referral program.  *See id.* ¶¶ 18–29.  More than 50,000 people have signed up as BLC "Referral Partners."  *Id.* ¶ 22.  Those who sign up receive extensive "interactive online trainings and instructional [Z]oom meetings where BLC teaches [them] how to market on [its] behalf," *id.* ¶ 26, and are provided with "e-mail templates, scripts, and signature blocks" that refer prospective customers "directly to BLC websites and BLC created information," *id.* ¶ 27; *see also id.* ¶ 28 (referring to BLC's online "training academy").  BLC "instructs its Referral Partners" to utilize "cold calling, cold email, direct mail, [and] various forms of online marketing."  *Id.* ¶ 29 (quotation marks omitted).  Referral Partners receive a 10% commission (taken from BLC's overall fee) for each customer they refer.  *See id.* ¶ 24.

### 4.    The Relationship Between the Robocall and BLC

The FAC pleads several alternative theories of liability for BLC arising from the August 30 robocall.  The Court reviews the allegations pertinent to each in turn.

####### a.    Direct liability

The FAC's first alleges direct liability. *See id.* ¶¶ 47–52.  It alleges that "BLC directly initiated the unlawful prerecorded telemarketing calls to Plaintiff and Class members and is directly liable for violating the TCPA." *Id.* ¶ 48.

As support, the FAC notes that the August 30 robocall was placed by (800) 728-9015, which, when called back, plays a prerecorded message: "[T]hank you for calling the Employee Retention Hotline brought to you by *Bottom Line Capital*." *Id.* ¶ 49 (emphasis added); *see also id.* ¶ 33.  Bottom Line Capital "is a d/b/a of BLC." *Id.* ¶ 34.  Before this litigation was filed, Bottom Line Capital's website had "note[d] that it is '*powered by Bottom Line Concepts.*'" *Id.* ¶ 35 (emphasis in original).  But "[s]ince the filing of this lawsuit, BLC has taken affirmative steps to make it appear that BLC had no connection to the calls, including by removing" any reference to BLC from Bottom Line Capital's website. *Id.* ¶ 50; *see also id.* ¶ 35 n.9.  The FAC infers that "BLC initiated and made the prerecorded calls," *id.* ¶ 51, "to drive [the recipients] to BLC for the purpose of engaging BLC to obtain an ERC tax refund on their behalf for a fee," *id.* ¶ 52.

####### b.    Actual authority

The FAC next alleges actual authority. *See id.* ¶¶ 53–66.  It alleges that BLC "sign[ed] contracts making the third parties (i.e., Referral Partners) authorized agents . . . to execute unlawful calls to Plaintiffs and Class members." *Id.* ¶ 57.  Even if BLC did not have "control over the list of persons to whom calls were made," BLC "specified and directed the third parties to essentially engage in all marketing means, including instructing them to specifically make 'cold calls.'" *Id.* ¶ 56; *see also id.* ¶ 64 (alleging that BLC "directed and controlled the conduct of the Referral Partners" by, *inter alia*, "closely controlling the content of the calls and

contacts"). "BLC knew that the third persons were engaged in marketing practices constituting unlawful calling to direct consumers to BLC and its services, in accordance with the specifications and contractual provisions agreed to by BLC and the Referral Partners." *Id.* ¶ 62.

The FAC acknowledges that "[d]ue to the anonymous/private nature of the websites and the subscriber information for the outbound phone numbers, [Martin] has no access to identify the exact relationship between BLC and the Referral Partner(s) who are the anonymous public facing arm of [BLC's allegedly] unlawful calling scheme." *Id.* ¶ 65.

### c.     Apparent authority

The FAC next alleges apparent authority. *See id.* ¶¶ 67–72.  It alleges that "BLC allowed the Referral Partners to provide the individuals they called with an electronic means to schedule calls directly with BLC representatives," *id.* ¶ 69, and "gave the Referral Partners the authority to use their websites, hyperlinks, URLs, trade name, trademark, service mark, forms, contracts, and materials," *id.* ¶ 70.  In other words, BLC gave third parties—its Referral Partners—"access to information that normally would be within [its] exclusive control" and exercised sufficient authority over its Referral Partners to know that they were "violating the TCPA on [its] behalf." *Id.* ¶ 67 (citation omitted).

### d.     Ratification

The FAC next alleges ratification. *See id.* ¶¶ 73–78.  It alleges that BLC "ratified the Referral Partners' TCPA violations" by (1) "knowingly accepting the benefit of new contacts with consumers despite the fact that these consumers were generated through conduct that violates the TCPA," *id.* ¶ 74, or (2) "willfully turning a blind eye" to the fact that its Referral Partners were violating the TCPA, *id.* ¶ 75; *see also id.* ¶ 76.  These violations were evident

based on the "numerous complaints" BLC received "regarding the conduct of the entities that ma[d]e prerecorded calls on their behalf." *Id.* ¶ 77.

e.        *Joint enterprise*

The FAC next alleges a joint enterprise.  It alleges that "BLC and its Referral Partners had a tacit agreement, or approved of after the fact, for the marketing of BLC's services by means that violate the TCPA, including making unsolicited calls to cellular phone numbers using a prerecorded or artificial voice, all without obtaining prior express consent to engage in such conduct." *Id.* ¶ 79.  It alleges: "BLC and the Referral Partners had an equal right to control the conduct thereof by specifying the type of people to be called, when to call, and what to say on the calls," *id.* ¶ 82, based on "an agreement" entered into between BLC and the Referral Partners "on how the proceeds of the unlawful activities would be apportioned among them," *id.* ¶ 83.

f.        *Acting in concert*

The FAC next alleges acting in concert.  *See id.* ¶¶ 85–96.  It alleges that "BLC acted in concert with the Referral Partners when they made the illegal calls in violation of the TCPA." *Id.* ¶ 85.  "BLC had a tacit understanding that the Referral Partners would engage in telemarketing activity that violated the TCPA," *id.* ¶ 89, and "gave the Referral Partners substantial assistance in accomplishing" the robocalls, *id.* ¶ 91.

**5.        BLC's Alleged Willful and Knowing Violations**

The FAC further alleges that BLC's violations of the TCPA have been "willful and knowing because BLC has received and responded to, via the Better Business Bureau, numerous consumer complaints about its unsolicited calling practices." *Id.* ¶ 99 (footnote omitted). "Despite these complaints, BLC adopted a culture of disregarding consumer requests to stop

calling and keeps calling, and allows and encourages its Referral Partners to keep calling." *Id.* ¶ 100.

### B.   Procedural History

On September 27, 2023, Martin initiated this action.  Dkt. 1.  On October 23, 2023, BLC moved to dismiss Martin's initial complaint, Dkt. 9, and filed a memorandum of law in support, Dkt. 10.  On October 24, 2023, the Court directed Martin to either amend her complaint or oppose the motion to dismiss by November 13, 2023.  Dkt. 12.  On November 13, 2023, Martin filed the FAC.  Dkt. 15.

The FAC brings one claim—asserted under the TCPA.  It alleges that Martin received a robocall on August 30, 2023 that was placed by BLC, either directly, *see id.* ¶¶ 47–52, or indirectly, through its Referral Partners, *see id.* ¶¶ 53–96, in violation of the TCPA.

Martin seeks to represent a class of "all persons within the United States to whose telephone number [BLC] placed (or had placed on its behalf) a prerecorded or artificial voice telemarketing call, from four (4) years prior to the filing of the Complaint through the date of Certification." *Id.* ¶ 106.  She seeks monetary damages and injunctive relief.  *See id.* at 22–23 (prayer for relief).

On December 4, 2023, BLC moved to dismiss the FAC under Rules 12(b)(1) and 12(b)(6), Dkt. 18, and filed a memorandum of law in support, Dkt. 19 ("Def. Br.").  On January 2, 2024, Martin filed a memorandum of law in opposition.  Dkt. 25 ("Pl. Br.").  On January 17, 2024, BLC filed a reply.  Dkt. 26 ("Def. Reply Br.").  On January 18, 2024, Martin filed a letter responding to arguments in the reply.  Dkt. 27.  On January 19, 2024, BLC replied to Martin's letter.  Dkt. 30.

On January 26, 2024, Martin filed a motion for leave to file a Second Amended Complaint based on "additional documentary evidence" she alleged recently came "to light as a result of [her] ongoing investigation." Dkt. 31 ("Pl. Leave to Amend Br."). On February 9, 2024, BLC filed a memorandum of law in opposition. Dkt. 34 ("Def. Leave to Amend Br.").

## II.    Discussion

### A.    BLC's Motion to Dismiss Under Rule 12(b)(1)

The Court considers at the threshold, as it must, BLC's argument that Martin's claim under the TCPA must be dismissed for lack of standing under Rule 12(b)(1).

### 1.    Applicable Legal Standards Under Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citation omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted). A court may properly refer to matters outside the pleadings when considering the existence of jurisdiction on a motion pursuant to Rule 12(b)(1). *See Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1010–11 (2d Cir. 1986).

In a motion to dismiss pursuant to Rule 12(b)(1), "the defendant may challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both." *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001) (citation omitted). When challenging the legal sufficiency, that challenge is "based solely on the allegations of the complaint or the complaint and exhibits attached to it," and thus "plaintiffs have no evidentiary burden, for both parties can be said to rely solely on the facts as alleged in the plaintiffs' pleading." *Katz v. Donna Karan*

*Co., LLC,* 872 F.3d 114, 119 (2d Cir. 2017) (citation omitted).  But when a defendant makes a

factual challenge, the defendant can "proffer[] evidence beyond the plaintiffs' pleading." *Id.*

(cleaned up).  Plaintiffs opposing such a motion must "come forward with evidence of their own

to controvert that presented by the defendant," or may instead "rely on the allegations in their

pleading if the evidence proffered by the defendant is immaterial because it does not contradict

plausible allegations that are themselves sufficient to show standing." *Id.* (cleaned up).

## 2.    Standing to Sue for Damages

The "irreducible constitutional minimum" of Article III standing has three elements: (1)

an "injury in fact" (2) "fairly traceable to the challenged action of the defendant" (causation) and

(3) "likely" to be "redressed by a favorable decision" (redressability). *Lujan v. Defs. of Wildlife,*

504 U.S. 555, 560–61 (1992) (cleaned up).  The thrust of BLC's argument as to standing—which

substantially tracks its argument under Rule 12(b)(6), discussed *infra*—is that Martin's FAC

does not adequately plead that BLC (as opposed to some other person or entity) was responsible

for the robocall on which the claim is based. *See* Def. Br. at 16–17.

As presented by BLC, this argument implicates the second and third elements of Article

III.  BLC does not dispute that the FAC pleads a cognizable injury in fact to Martin.  It clearly

does.  The TCPA aims to "protect[] telephone consumers from th[e] nuisance and privacy

invasion" occasioned by "[u]nrestricted telemarketing." Pub. L. No. 102-243, § 2, ¶¶ 6, 12.  In

relevant part, the TCPA makes it "unlawful . . . to make any call (other than a call made for

emergency·purposes or made with the prior express consent of the called party) using any

automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular

telephone service" or to a "residential telephone line." 47 U.S.C. §§ 227(b)(1)(A)(iii), (b)(1)(B);

*see also King v. Time Warner Cable Inc.,* 894 F.3d 473, 474 (2d Cir. 2018). "In plain English,

the TCPA prohibit[s] almost all robocalls." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S.

Ct. 2335, 2344 (2020) (plurality opinion). The FAC alleges that Martin received such a robocall

on August 30, 2023. FAC ¶¶ 30–39. Such clearly pleads an Article III injury in fact, as the

Second Circuit held in *Melito v. Experian Marketing Solutions, Inc.*, 923 F.3d 85 (2d Cir. 2019).

*See id.* at 92–95 (injury in fact based on single text-message); *see also, e.g.*, *Dickson v. Direct

Energy, LP*, 69 F.4th 338, 343–48 (6th Cir. 2023) (injury in fact based on single robocall); *Lupia

v. Medicredit, Inc.*, 8 F.4th 1184, 1191–93 (10th Cir. 2021) (same).

BLC, however, disputes the latter two elements of Article III standing.[2] It argues that the

FAC does not plead "facts showing any conduct attributable to BLC, as opposed to third parties"

and "facts from which the Court could infer that BLC had any relationship with" those third

parties, including "Bottom Line Capital." Def. Br. at 16–17. BLC attacks as scant the FAC's

factual allegations tying the robocalls to it. These centrally are that the prerecorded message

directs the caller to a 1-800 number which answers with a message identifying the number as

"the Employee Retention Hotline brought to you by Bottom[ ]Line Capital," FAC ¶ 33, which

the FAC alleges "is a d/b/a" of BLC, *id.* ¶ 34, for which BLC is responsible, *id.* ¶¶ 35–37. BLC

argues the FAC too sloppily equates it with a (presumably like-initialed) entity responsible for

the calls.

Framed under Rule 12(b)(6) as a challenge to whether the FAC states a plausible claim of

BLC's liability, that argument is a responsible one (albeit unsuccessful as reviewed below). As a

challenge to Article III standing, however, that argument is ill-conceived. That is because,

---

[2] Because BLC challenges Martin's standing based solely on the allegations of the FAC, Martin
does not bear any evidentiary burden on this motion, and the Court must accept as true the well-
pled facts in the FAC. *Katz*, 872 F.3d at 119 (citation omitted); *see also, e.g.*, *Denney v.
Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006).

although labeled a challenge to the district court's subject-matter jurisdiction, BLC's objections "actually attack the merits of [the p]laintiff's claims." *Melito*, 923 F.3d at 94 n.6. And, as the Second Circuit has often explained, "[t]he standing question is distinct from whether [the plaintiff] has a cause of action." *Carver v. City of New York*, 621 F.3d 221, 226 (2d Cir. 2010); *see also Bond v. United States*, 564 U.S. 211, 219 (2011) ("[T]he question whether a plaintiff states a claim for relief 'goes to the merits' in the typical case, not the justiciability of a dispute . . . ." (quoting *Steel Co.*, 523 U.S. at 92 (1998))). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Pettus v. Morgenthau*, 554 F.3d 293, 298 (2d Cir. 2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). BLC's argument that the FAC does not adequately allege its responsibility for the August 30, 2023 and other robocalls presents a quintessential merits dispute. To term such an issue jurisdictional "would essentially collapse the standing inquiry into the merits." *Baur v. Veneman*, 352 F.3d 625, 642 (2d Cir. 2003).

The causation and redressability elements of the standing inquiry are not addressed to whether a defendant's liability is well pled. They focus on whether the plaintiff's injury-in-fact is too far removed from the challenged action (causation) or the potential relief (redressability). *Cf., e.g.*, *Dep't of Educ. v. Brown*, 600 U.S. 551, 564–68 (2023) (finding insufficient link between plaintiffs' requested relief—invalidation of an agency's loan-forgiveness program—and their injury—the agency's decision not to include privately held loans in that program); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344–46 (2006) (finding insufficient link between plaintiffs' requested relief—invalidation of state's tax credits and appropriations—and their injury—the amount they pay in state taxes); *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40–45 (1976) (finding insufficient link between challenged action—enactment of an IRS rule

beneficial to non-profit hospitals—and plaintiff's injury—hospitals' refusal to treat indigent patients); *Linda R.S. v. Richard D.*, 410 U.S. 614, 617–18 (1973) (finding insufficient link between challenged action—the failure to prosecute a child's delinquent father—and plaintiff's injury—his failure to pay child-support payments). But the "missing link" that BLC asserts that is lacking in the FAC "is not between the injury and the challenged action"—instead, it is between "the challenged action and the defendant." *Zeitlin v. Palumbo*, 532 F. Supp. 3d 64, 68 (E.D.N.Y. 2021). That link goes to the merits, not to Martin's standing to sue.

The Second Circuit's decision in *SM Kids, LLC v. Google LLC*, 963 F.3d 206 (2d Cir. 2020), is instructive on this point. The plaintiff there (SM Kids) alleged that it had been assigned a third-party's interest in a contractual agreement with the defendant (Google). *See id.* at 209–10. Google argued that the assignment was ineffective such that SM Kids lacked standing to enforce it. *See id.* at 211. The Circuit rejected the claim that such a defect would be jurisdictional. "[T]he validity of the assignment," it held, was not "a question of Article III standing," as it did not "speak[] to the power of a court to adjudicate a controversy." *Id.* at 211. "Although the question of whether Google breached a contract with SM Kids depends on whether SM Kids enjoyed a contractual relationship with Google, the existence of such a relationship is not a prerequisite to a court's power to adjudicate a breach-of-contract claim." *Id.* "Under Google's approach," the Circuit explained, "courts would lack jurisdiction in most instances where a breach-of-contract plaintiff failed to prove the existence of a contract." *Id.* at 211–12. Such an argument thus "goes to the merits," upon which a court's "threshold inquiry into standing in no way depends." *Id.* at 212 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

BLC's notion that where a complaint pleads facts that too thinly identify a defendant as the actor responsible for a legal wrong, there is a lack of Article III standing, is problematic for a further reason. Because standing must be established at all stages of a case, BLC's conception of standing could prevent a defendant from ever durably extricating itself from civil liability where it was confused with the actual wrongdoer. To illustrate, consider a simple automobile collision case with one plaintiff (Patrick) and one defendant (Doris). Patrick alleges that Doris drove the car that injured him. At trial, Doris's only defense is that the driver was actually her identical twin sister (Tori). Assume that Doris succeeds—that the jury so finds in a special interrogatory. On BLC's theory, the court would be in error to enter judgment on the merits in favor of Doris. That is because, on BLC's view of standing, the jury rejected the proposition that Patrick's injury was "fairly traceable" to Doris's conduct, because the collision was instead "the result of the independent action of some third party not before the court," namely, Tori. *Lujan*, 504 U.S. at 560 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). It would instead be required to dismiss the case for want of subject-matter jurisdiction (based on lack of standing). *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").[3] And a dismissal for lack of standing is, "by definition, without prejudice." *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 445 (2d Cir. 2022). As such, on BLC's equation of a failure to prove responsibility for a wrong with a lack of

---

[3] That Patrick had adequately pled subject-matter jurisdiction would not alter this result, as the court would be required to ascertain standing throughout. As the Supreme Court has explained, because standing is "an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Where facts relevant to standing are disputed, they "must be 'supported adequately by the evidence adduced at trial,'" or the court's jurisdiction is lacking. *Id.* (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 114–115 & n.31 (1979)).

standing, Patrick could theoretically sue Doris again and again, and perhaps eventually prevail.[4]
See *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573, 581 (7th Cir.
2019) (to preclude a plaintiff "from relitigating—in any court, ever again—any claim
encompassed by the suit" requires "a ruling on the merits.").

    The case law does not support treating as jurisdictionally defective cases in which the
plaintiff failed to establish merits elements such as but-for causation (*e.g.*, in a tort case) or the
validity of a contractual assignment to a defendant (*e.g.*, in a contract-breach case). *See Wooden
v. Bd. of Regents*, 247 F.3d 1262, 1280 (11th Cir. 2001) ("the [Supreme] Court's jurisprudence"
does not "conceive[] of the standing inquiry as duplicating an inquiry into the merits"); *see also
SM Kids*, 963 F.3d at 212. For this reason, most district courts have treated a TCPA plaintiff's
alleged failure to identify the proper defendant as an issue going to the complaint's merits, but
not to the court's jurisdiction. *See Zeitlin*, 532 F. Supp. 3d at 69 (collecting cases); *see also In re
Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 788 (N.D. Cal. 2019).
*But see, e.g., Scruggs v. CHW Grp., Inc.*, No. 20 Civ. 48 (RJK), 2020 WL 9348208, at *3–7
(E.D. Va. Nov. 12, 2020) (holding that failure "to plead non-conclusory facts linking [defendant]
to" the challenged robocall necessitated dismissal under Rule 12(b)(1) for lack of standing);
*Barker v. Sunrun Inc.*, No. 18 Civ. 855 (KG) (LF), 2019 WL 1983291, at *3 (D.N.M. Apr. 29,
2019) (same). This Court adopts that majority view.

---

[4] To be sure, a dismissal "for lack of subject-matter jurisdiction can, through the doctrine of issue
preclusion, bar the invocation of a federal court's subject-matter jurisdiction in a second lawsuit
based on the same facts," *Reed v. Columbia St. Mary's Hosp.*, 782 F.3d 331, 335 (7th Cir. 2015).
But a prior dismissal generally "does not preclude a second action on the same claim if the
justiciability problem can be overcome" through additional evidence or an intervening change in
law, 13D Wright & Miller, *Federal Practice & Procedure* § 4436 (3d ed., Sept. 2023 update).

The Court thus rejects BLC's threshold challenge under Rule 12(b)(1) as to Martin's standing to bring this action. Accepting the FAC's allegations as true, Martin suffered an injury in fact—a "nuisance and privacy invasion"—by receiving an unsolicited robocall. *Melito*, 923 F.3d at 93. Her injury is traceable to the robocall. *See id.* at 94–95. And the award she seeks, of actual or statutory damages, would redress that injury. *See Van v. LLR, Inc.*, 61 F.4th 1053, 1063–64 (9th Cir. 2023). She thus has standing to sue for damages.

### 3.    Standing to Sue for an Injunction

BLC separately moves to dismiss the FAC's prayer for injunctive relief under Rule 12(b)(1), also for lack of standing. Because "standing is not dispensed in gross," Article III requires a plaintiff to demonstrate standing separately for each form of relief sought. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). As a result, a plaintiff who pursues injunctive relief must separately demonstrate the three familiar elements of standing—injury in fact, causation, and redressability—as to her request for injunctive relief. *Cacchillo v. Insmed*, Inc., 638 F.3d 401, 404 (2d Cir. 2011). "Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111–12 (1983)). Neither allegations of possible future injury nor past exposure to illegal conduct is sufficient to clear this bar. *Nicholas v. Trump*, 433 F. Supp. 3d 581, 587 (S.D.N.Y. 2020).

BLC argues that the FAC fails to plead that Martin "is likely to be harmed again in the future in a similar way" by BLC, even accepting as true her allegation that she received one robocall from BLC in the past. *Nicosia*, 834 F.3d at 239. BLC is correct. "Allegations of possible future injury do not satisfy the requirements of Art[icle] III." *Whitmore*, 495 U.S. at

158.   Although the FAC asserts that Martin has "received numerous prerecorded calls from BLC,

. . . the full extent of which will be confirmed in discovery," FAC ¶ 31, it provides factual detail

as to only one such robocall—the robocall received on August 30, 2023.  *See id.* ¶¶ 32–33.  That

call was received a month before Martin filed suit and several months before she filed the FAC.

The FAC does not plead facts supporting the proposition that Martin will ever receive a second

(or third or fourth) robocall from BLC.  It thus does not adequately plead that "the threatened

injury is 'certainly impending,' or [that] there is a 'substantial risk' that the harm will occur."

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted).  Without more,

the FAC does not adequately plead a claim for injunctive relief.  *See, e.g., Blair v. Assurance IQ*

*LLC*, No. 23 Civ. 16 (KKE), 2023 WL 6622415, at *5 (W.D. Wash. Oct. 11, 2023) (no standing

to seek injunctive relief where plaintiff "only received calls over a period of seven days" months

before filing suit); *Doyle v. Matrix Warranty Sols., Inc.*, No. 22 Civ. 3198 (MEF) (AME), 2023

WL 4188313, at *1 (D.N.J. June 26, 2023) (no standing to seek injunctive relief where plaintiff

only received one robocall); *Miller v. Time Warner Cable Inc.*, No. 16 Civ. 329 (CAS) (ASX),

2016 WL 7471302, at *4 (C.D. Cal. Dec. 27, 2016) (no standing to seek injunctive relief where

plaintiff "had not received an unsolicited call . . . in approximately eight months" before filing

suit).[5]

---

[5] Martin argues that she need not "plead continuing or possible future injury" because a plaintiff may seek an injunction "as one of the express remedies affirmatively provided for in the TCPA." Pl. Br. at 15.  That is wrong.  "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016).  Without a real or immediate threat of injury, *Lyons*, 461 U.S. at 111–12, Martin lacks standing to seek injunctive relief.

The Court thus dismisses, for want of Article III standing, the prayer for injunctive relief. Because the dismissal is based on the absence of subject-matter jurisdiction, the dismissal is without prejudice.

### B.       BLC's Motion to Dismiss Under Rule 12(b)(6)

The Court next considers BLC's challenge to the FAC under Rule 12(b)(6).

#### 1.       Applicable Legal Standards Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

#### 2.       BLC's Alleged Liability

Under the TCPA, a plaintiff must allege either (1) direct liability (*i.e.*, that the defendant placed the robocall) or (2) vicarious liability (*i.e.*, that the defendant has an agency relationship with the third-party that placed the robocall). *See Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1014 (9th Cir. 2018); *see also Hale v. Teledoc Health, Inc.*, No. 20 Civ. 5245 (VB),

2021 WL 1163925, at *3 (S.D.N.Y. Mar. 25, 2021) (collecting cases). BLC challenges the plausibility of the FAC's claim that BLC was responsible for the robocalls at issue on either theory. It argues that the FAC is conclusory on this point. Def. Br. at 6–14.

BLC is wrong. The FAC alleges that "BLC directly initiated" the call at issue, FAC ¶ 48, and pleads "factual content [that] allows the court to draw the reasonable inference that [BLC] is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678. It pleads that the phone number from which the robocall was placed, when called back, played a message: "[T]hank you for calling the Employee Retention Hotline brought to you by Bottom[ ]Line Capital." FAC ¶ 49. It further alleges that "[a]t the time of the call[]," Bottom Line Capital's website "note[d] that it is *'powered by Bottom Line Concepts*,'" *id.* (emphasis in original), and that Bottom Line Capital "is a d/b/a of BLC"—that is, that Bottom Line Capital is a trade name used by BLC. *Id.* ¶ 35. Based on these factual allegations, a reasonable factfinder could draw several relevant inferences: that Bottom Line Capital owned and controlled the phone number used to place the robocall to Martin; that Bottom Line Capital, as the owner of the phone number used to place the robocall, and as the beneficiary of the message conveyed via the robocall, placed the robocall; and that Bottom Line Capital is a pseudonym of BLC, such that an action by Bottom Line Capital is an action by BLC. These allegations plausibly plead BLC's liability for the robocalls Martin claims to have received. *See, e.g.*, *Bank v. CreditGuard of Am.*, No. 18 Civ. 1311 (PKC) (RLM), 2019 WL 1316966, at *8 (E.D.N.Y. Mar. 22, 2019) (direct liability plausibly pled where complaint alleged that plaintiff spoke to a "live operator," at the same phone number from which the robocall originated, who was "someone from" one of defendant's entities); *Morris v. SolarCity Corp.*, No. 15 Civ. 5107 (RS), 2016 WL 1359378, at *1–2 (N.D. Cal. Apr. 6, 2016) (direct liability plausibly pled where complaint alleged that plaintiff returned the robocall, gave a

18

"fictitious name and address" to the "computer-generated voice," and the next day "received a

phone call from a live operator who identified himself as a representative of [defendant] and . . .

asked [plaintiff] to confirm the fictitious name and address"); *Charvat v. Allstate Corp.*, 29 F.

Supp. 3d 1147, 1150–51 (N.D. Ill. 2014) (direct liability plausibly pled where complaint alleged

that the robocall transferred plaintiff to "another line where he heard a 'prerecorded message that

welcomed plaintiff to [a third-party] and noted that [the third-party] was backed by

[defendant]'"). The FAC's allegations nudge Martin's TCPA claim "across the line from

conceivable to plausible." *Twombly*, 550 U.S. at 570.

The precedents BLC cites are inapposite. In each, the complaint "[m]erely allege[d]" that

the defendant "'made' or 'initiated'" the challenged robocall, but did not cite facts supporting

that conclusion. *See Frank v. Cannabis & Glass, LLC*, No. 19 Civ. 250 (SAB), 2019 WL

4855378, at *2 (E.D. Wash. Oct. 1, 2019); *see also, e.g.*, *Bank v. Vivint Solar, Inc.*, No. 18 Civ.

2555 (MKB) (RLM), 2019 WL 2280731, at *3 (E.D.N.Y. Feb. 25, 2019), *report and*

*recommendation adopted*, 2019 WL 1306064 (E.D.N.Y. Mar. 22, 2019) (complaint alleged that

defendant "placed, or directed to be placed," the robocall, but did not plead any specifics as to

the source of the call or the entity or entities whose business was being promoted); *Childress v.*

*Liberty Mut. Ins. Co.*, No. 17 Civ. 1051 (MV) (KBM), 2018 WL 4684209, at *3 (D.N.M. Sept.

28, 2018) (complaint alleged that "the call was made by 'Defendant's pre-recorded message

robot machine,'" but lacked factual detail "to support [his] conclusory assertions"). Here, in

contrast, the FAC pleads who placed the call (Bottom Line Capital) and pleads facts supporting

the inference of a relationship between that entity and the defendant (BLC). "[T]he plausibility

standard does not require [the] plaintiff to definitively connect [the] defendants to the calls

received." *Zeitlin*, 532 F. Supp. 3d at 71. Nor does it require the plaintiff to disprove the

possibility that the robocall was "placed by some independent third party, from which [the defendant] merely purchased the 'sales lead.'" *SolarCity*, 2016 WL 1359378, at *2. "Perhaps this is an inference that a factfinder might ultimately make, but at this stage" the Court "must draw all inferences in favor of the plaintiff[], not the defendant[]." *Edrei v. Maguire*, 892 F.3d 525, 539 (2d Cir. 2018).

The Court thus denies BLC's motion to dismiss Martin's FAC under Rule 12(b)(6) for failure to state a claim.[6]

### 3.    Applicability of Treble Damages

BLC separately moves under Rule 12(b)(6) to dismiss the FAC's prayer for treble damages.  Under the TCPA, if "the defendant willfully or knowingly violated" the statute, "the court may, in its discretion," award treble damages to the plaintiff.  42 U.S.C. § 227(b)(3); *see also Melito*, 923 F.3d at 89.  BLC argues that the FAC lacks allegations supporting a finding of willful or knowing TCPA violations.  Def. Br. at 14–15.

The Court denies this motion as procedurally premature.  *Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 522, 536 (S.D.N.Y. 2013).  A motion to dismiss under Rule 12(b)(6) "is addressed to a 'claim'—not to a form of damages." *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 318 n.5 (S.D.N.Y. 2010).  Treble, like punitive, damages are "a form of damages, not an independent cause of action." *Hunter v. Palisades Acquisition XVI, LLC*, No. 16 Civ.

---

[6] Because the Court finds the FAC to plausibly plead BLC's direct liability, it does not have occasion to pass on its alternative theory of vicarious liability.  "A cause of action that is based on one set of facts but that contains multiple, alternative legal theories supporting relief is still just one 'claim.'" *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 343 F. Supp. 3d 94, 100 (E.D.N.Y. 2018).  Because Rule 12(b)(6) does not "permit piecemeal dismissals of *parts* of claims," *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (emphasis in original), "once a court determines that a claim states a viable basis for relief, it cannot further parse out whether other portions of the claim would suffice on their own," *Fed. Trade Comm'n v. Facebook, Inc.*, 581 F. Supp. 3d 34, 60 (D.D.C. 2022) (collecting cases).

8779 (ER), 2017 WL 5513636, at *9 (S.D.N.Y. Nov. 16, 2017). Whether Martin can adduce evidence sufficient to support an award of treble damages cannot be resolved until after discovery, either on a motion for summary judgment or at trial.[7] *See, e.g., Denton v. McKee*, 332 F. Supp. 2d 659, 667 (S.D.N.Y. 2004) (denying motion to dismiss as premature "to the extent it seeks to preclude certain categories of damages"); *see also Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 220 (S.D.N.Y. 2019). The Court thus denies the motion to dismiss the prayer for treble damages.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part BLC's motion to dismiss. The Court dismisses the FAC's request for injunctive relief without prejudice. The Court otherwise denies the motion to dismiss. The Court denies BLC's motion for argument as moot.

Relatedly, the Court grants Martin's motion for leave to file a Second Amended Complaint ("SAC"). A court "should freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2). Such a motion should be granted in the absence of "undue delay, bad faith or dilatory motive on the part of the movant." *Foman v. Davis*, 371 U.S. 178,

---

[7] As this Court has recognized, motions to dismiss may be directed at prayers for relief where particular damages are unavailable as a matter of law. *Doe v. Indyke*, 457 F. Supp. 3d 278, 283–85 (S.D.N.Y. 2020) (collecting cases and noting that such motions have alternatively been cast, and granted, as motions to strike under Rule 12(f)). But treble damages are available under the TCPA. Whether they are available in this case will turn on the factual record and thus cannot be resolved at this juncture. *See, e.g., Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*, No. 22 Civ. 9766 (LJL), 2023 WL 4211035, at *20 (S.D.N.Y. June 27, 2023) (denying motion to strike prayer for punitive damages where such damages are not categorically unavailable); *see also Burrell v. State Farm & Cas. Co.*, 226 F. Supp. 2d 427, 440 (S.D.N.Y. 2002) (motion to strike prayer for punitive damages addresses "the relief to which the plaintiffs are entitled, rather than the sufficiency of the claims in the pleadings, and it would be premature to address these issues before these claims have been decided").

182 (1962).  Here, insofar as the Court has sustained Martin's FAC—and given that the SAC

supplements the FAC with additional factual allegations—the SAC will not prejudice BLC or

significantly delay the resolution of the dispute.  *AEP Energy Servs. Gas Holding Co. v. Bank of*

*Am., N.A.*, 626 F.3d 699, 726–27 (2d Cir. 2010) (citation omitted); *see also, e.g.*, *Abbatiello v.*

*Monsanto Co.*, 571 F. Supp. 2d 548, 552–53 (S.D.N.Y. 2008) (granting leave to amend where

plaintiffs sought "to amend the factual allegations . . . without asserting any new claims").

Amendment is thus proper.

BLC must answer the SAC by March 28, 2024.  By separate order, the Court will

schedule an initial pretrial conference.  The Clerk of Court is respectfully directed to terminate

all pending motions.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 14, 2024
      New York, New York